The CITY OF CAMERON, Missouri, a Municipal Corporation, Plaintiff-Appellant,

v.

Kenneth D. STAFFORD, et al., Defendants-Respondents.

The CITY OF CAMERON, Missouri, a Municipal Corporation, Plaintiff-Appellant,

v.

Wilma E. JONES, et al., Defendants-Respondents.

No. 25536.

Kansas City Court of Appeals, Missouri.

April 5, 1971.

Melvin E. Griffin, Bob F. Griffin, Griffin & Griffin, Cameron, for plaintiff-appellant.

Harold L. Miller, Robison & Miller, Maysville, for defendants-respondents.

SHANGLER, Presiding Judge.

The City of Cameron, of the third class and operating under the City Manager form of government, brought two separate suits for declaratory judgment under Sec. 71.015, V.A.M.S., seeking judicial confirmation of proposals to annex two distinct tracts containing 317 acres of land lying adjacent. In each case two defendants were sued as representatives of a class, and in neither case is there any contention that the defendants did not fairly represent the class. The actions were consolidated for trial, tried to the court, and appealed as consolidated. The trial court denied the City's petitions and we affirm those judgments. We are essentially in accord with the findings of fact, and completely in accord with the conclusions of law, given by the trial court to support his judgments.

The present boundaries of the plaintiff City contain about 1452 acres, the bulk of which is in Clinton County, and the rest spills over into DeKalb County to the north. It was brought to this size by the addition of an undisclosed acreage by annexation in 1963 and by the subsequent annexation of approximately 252 acres on December 22, 1969. Of this most recently annexed area, 216 acres were added to the east corporate limits so that the City is presently bounded to the east, generally, by Interstate 35. Other small acreages were annexed in 1969 including Redbud Addition, a platted area near the southern edge of the City, and a portion of North Cameron Heights, another platted area in DeKalb County to the north. As now constituted, Cameron lies astride U. S. 69 which runs through it north and south, and each part of the City has easy access to the network of highways within and surrounding it. State Access Route BB, sometimes referred to as I-35 business loop, forms the southern boundary of the City at its most southeasterly extension and connects U. S. 69 to the west with I-35 to the east.

The lands sought to be annexed by these proceedings have been referred to throughout as the Stafford Tract and the Jones Tract.

### THE STAFFORD TRACT

The Stafford Tract, containing about 163 acres of gently rolling land, lies immediately south of State Access Route BB, the existing southern boundary of the City's southeastern extremity. This tract is in the form of an "L", and from its jointure near the intersection of Route BB and U. S. 69, one arm extends east from U. S. 69 to 300 feet beyond I-35 at a uniform depth of 810 feet, and the other extends north and south along U. S. 69 and encompasses somewhat more than two quarter sections. The dwellings and business houses of the sixteen residents of the Stafford Tract (as well as the five acre city cemetery) are all strung along the perimeter formed by Route BB and U. S. 69. Except for the land these buildings and their uses require, the rest, 145 of the 163 acres sought in annexation, remains unimproved pasture. Each of the residents, except for the Tindalls, who occupy the easternmost 300 foot strip, is served by at least one City utility. But only the Four County Implement Company is connected to the City sewer system, presumably at its own expense. This tract is served by the volunteer Cameron Fire Department and benefits also from occasional Cameron police

patrols. City electricity is available as is water by connecting with the City water main, also presumably at the user's expense. The closest City sewer is located 700 feet east of U. S. 69 on the north side of Route BB, from whence a sewer line runs north and east to the City sewage disposal dump.

The Four County Implement Company, an Allis Chalmers outlet, is located at the juncture of Route BB and U. S. 69 and the other businesses on the tract extend south from there along U. S. 69. They include a liquor store, a Pontiac sales and service business and the Stafford Red X Motors, a combination Buick sales and service agency and filling station which occupies an 800 foot front on U. S. 69. From that point south, the land becomes pastoral once again and is unimproved except for a few farm buildings.

The Stafford Tract was said by witnesses for the City to be very desirable for both residential and commercial development. Leo Farnon, a Cameron realtor, expressed his opinion that it had a value of $1000 per acre, much more than such land would be worth for exclusively agricultural purposes. There was no evidence, however, of any sales of such land at any price.

## THE JONES TRACT

The Jones Tract also lies to the south of the present corporate limits, is bounded on the east by U. S. 69 which separates it from the Stafford Tract to the east. Its own south boundary is on a line with the south boundary of the Stafford Tract. The Jones Tract contains 154 acres, including Crestview Subdivision, a 40 acre area platted by Mr. and Mrs. Jones in 1966. (Mr. and Mrs. Jones, who live in the subdivision, also own a tiny motel also located there, as well as all the platted lots which have remained unsold and most of all the other land in the tract.) The subdivision abuts Park Avenue (the southern corporate boundary at that point) on the north and U. S. 69 on the east. Of the lots platted

—and almost 100 lots appear on Plaintiff's Exhibit 2—only one commercial and five residential lots have been sold, the last of them in 1967. Mr. Jones explained that his immediate design was to have gas available for only the front tier of lots facing Park Avenue, but before a gas main could be installed and gas service be made available at all, it was required that he record a plat of the entire forty acres. Although the recorded plat delineates lots and streets, in fact the only street servicing the subdivision is Park Avenue on which it fronts. So apart from the six lots which have been sold, the Jones dwelling and the modest two-unit motel they own and operate, the rest of the forty acres of the subdivision remains unimproved pasture land.

The quarter-section immediately to the south of the subdivision contains four dwellings, those of Reno, Collins, Koechner and Pollard, each facing U. S. 69 to the east. The balance of the quarter-section as well as of the entire Jones Tract to the west remains open country, so that of the 154 acres sought to be annexed, 135 are unimproved pasture land. It is as pasture for his hogs and cattle that Jones uses that land. The land west of the four dwellings was terraced because of its roughness. It becomes even rougher to the west where it is cut by a "big ditch" which empties into the Burlington Reservoir, a source of the City's water supply, lying southwest of the tract. The City's witnesses acknowledged a variance in elevation in the tract not exceeding 40 or 50 feet and that it would not be as desirable for development as the Stafford Tract, but desirable nonetheless. Jones testified that the westerly portions could not be used without a considerable expenditure for grading.

All of the twenty-eight residents of the Jones Tract, as well as the few businesses conducted there, have the benefit of some City service. Only those lots in the subdivision fronting on Park Avenue, however, have access to the City sewer system. They are connected to a sewer line having

the capacity to serve twenty-four dwellings, installed by Jones at a cost of almost $9000. The construction of a lift station was also necessary since the natural flow of the tract is to the southwest and the City's sewage disposal dump is to the northeast. The water main was installed at a cost of about $2250. It was such costs, particularly for the sewer line, which prompted Jones to give up any serious effort to sell additional lots other than the remaining frontage lots for which he had already made provision for water and sewage disposal.

The Jones Tract, including the only businesses it contained—the motel and Reno's accounting office, both fronting on U. S. 69—had the benefit of the same fire and police protection as was available to the Stafford area. The City's recreational facilities were also used by some of the residents.

Admittedly, those platted lots fronting on Park Avenue and the unplatted sites along U. S. 69 brought higher prices than if they had been sold for purely agricultural uses. As to the balance of the tract, its fair market value was $400 to $500 per acre according to Mrs. Jones, and $1000 per acre according to Mr. Farnon, the City's witness.

## THE CITY OF CAMERON

The evidence depicts plaintiff as a forward-looking, fiscally sound, enterprising city. Its police department, consisting of a chief and four officers, is equipped with two radio cars, at least one of which is on patrol the day around. From its base station, messages are received and transmitted on two frequencies by a dispatcher on duty throughout the day and night. Cameron police have patrolled along Route BB, U. S. 69 and Park Avenue which are the common boundaries of the City and the areas sought to be annexed. For the past three years, the police department has also answered calls from the Stafford and Jones Tracts because they are considered by the City to be within its "trade area". For the same reason, the Cameron volunteer fire department has been servicing the Stafford and Jones Tracts for the past two years. The personnel and equipment of both departments seem reasonably adequate to accord these two tracts, if annexed, the same municipal services now rendered to Cameron.

Cameron's water supply, purification and distribution systems are more than adequate for its present and reasonably foreseeable needs. Water mains are available throughout to the edges of the present corporate boundaries, and in some instances, beyond them. The water purification system, thoroughly renovated in 1960, is in excellent condition and meets the standards set for the State Department of Health. Three reservoirs, including Burlington which adjoins the Jones Tract at its southwest, impounds water in such supply as to exceed the recommended standards for a population of 5500. The City's electrical generating system, located at the water plant, produces power on demand, but most of the electricity distributed is purchased from the Platte-Clay Cooperative. The distribution system, including transmission lines, has been recently rebuilt and is entirely owned by the City. Cameron is presently capable of furnishing the Stafford and Jones Tracts all its prospective power needs. The Gas Service Company furnishes natural gas to all points of the City. It also serves those areas annexed in 1969 and those Jones Tract lots fronting on Park Avenue where gas mains have been installed.

The City's present sewage treatment and disposal facilities located across Route BB north of the Stafford Tract are adequate for a population of 5000. The sewer lines have not been extended by the City into those areas annexed in 1969 nor are there any plans to do so. Thus, a property owner or developer wishing the amenity of the City sewer system is required to connect to an existing City main, sometimes some distance away, at his own expense. The cost

of such installations to the Stafford and Jones Tracts becomes more significant because the adverse slope of its terrain does not permit natural drainage to the City's disposal plant but the drainage must be created through the use of lift stations which must also be constructed. The City Manager was uncertain whether Cameron's present sewer system and disposal facilities could accommodate the needs of the Jones (and presumably, Stafford) Tract when fully developed.

A Park Board operates the City's 196 acres of park land, including a golf course located in an unincorporated area immediately west of the Jones Tract's Crestview Subdivision. The Community Hospital was recently expanded to its 64 bed capacity. Cameron has nine churches, three schools and two free parking lots. It has adopted a comprehensive plan for city development. New lights are being installed to illuminate the streets and a continuous program of curbing and guttering at least ten blocks each year has been initiated.

Cameron's total assessed valuation is $6,000,000. Its bonded indebtedness is well within authorized limits. It has recently built an airport with a hard-surfaced, all-weather landing strip. It has two hundred and twenty businesses, largely retail, two banks and one savings and loan association. Vigorous efforts to attract industry have succeeded to the extent that the Ithaca Gun Co. of Ithaca, New York, and the National Brass Foundry Company of Independence, Missouri, have undertaken to relocate (whether all or part of their operation is uncertain) in Cameron. To induce (or perhaps as a condition of) Ithaca's relocation, the City voted a $300,000 industrial revenue bond issue for the purchase of a site and construction of plant to the west of the present corporate limits. It was expected that 25 to 35 persons would be employed initially. The National Brass Foundry Company has purchased eight acres within Cameron and is expected to employ about 135 persons. As part of the City's agreement with Ithaca, annexation of the plant site was to be undertaken as soon as reasonably possible. It was also shown that the Hallmark Company recently purchased 2200 acres some 35 miles south of Cameron on I–35. Kansas City's Mid-Continent Airport is located some forty-five miles to the southwest of the City.

◾ We have noted that plaintiff by separate petitions seeks judicial declarations of the reasonableness and necessity of its proposed annexations of each tract. These petitions were filed as authorized by separate resolutions of annexation adopted by the City Council of Cameron which resolutions also called for the holding of an election as to each proposed annexation. In such circumstances, the validity (or lack of it) of one annexation is not determinative of that of the other. Cf. City of Bourbon v. Miller, Mo., 420 S.W.2d 296, 301 [5, 6].

Sec. 71.015, V.A.M.S. which governs such proceedings, requires each petition to state facts showing:

1. The area to be annexed.

2. That such annexation is reasonable and necessary to the proper development of petitioner city.

3. The ability of said city to furnish normal municipal services of said city to the unincorporated area within a reasonable time after the annexation is to become effective.

Under this act, the procedural burden of establishing these statutory elements by evidence rests on the city seeking annexation. City of Olivette v. Graeler, Mo., 338 S.W.2d 827, 833 [2, 3]. The trial court found that the annexation of neither tract was reasonable because not necessary to the proper development of plaintiff City. It also found that the City did not have the ability to furnish its municipal services to the unincorporated areas within a reasonable time after annexation. We are led to the same conclusions.

The question of whether city boundaries shall be extended is a legislative function delegated to the governing body of a city (by Sec. 77.020, V.A.M.S., as to cities of the third class) and so is a matter of political decision resting within the legislative action; and if there is a sufficient showing of reasonableness to make that question fairly debatable, then the legislative decision is conclusive. City of St. Joseph v. Hankinson, Mo., 312 S.W. 2d 4, 8 [6, 7]. The appellant City argues that the evidence raises a fairly debatable question of the necessity for the annexations and therefore its petitions must be sustained. The "necessity" which Sec. 71.-015 requires to be pleaded and proved, however, is only one aspect of the "reasonableness" which is the ultimate judicial inquiry into such proceedings. City of St. Joseph v. Hankinson, 1. c. 9 [6, 7]. Thus, reasonableness is not made out by a showing of the City's necessity alone, since the area to be annexed is also entitled to the test of reasonableness. City of Olivette v. Graeler, 338 S.W.2d 1. c. 836, 837; City of St. Ann v. Buschard, Mo.App., 356 S.W.2d 567, 575 [7, 8]. The comparative benefits and detriments to both the City and area to be annexed, therefore, are considerations in any judicial determination of the reasonableness of an annexation. City of Salisbury v. Nagel, Mo.App., 420 S.W.2d 37, 44 [13, 14].

The extent of plaintiff's failure to prove the reasonableness of each annexation is disclosed by reference to the theory of recovery pleaded in plaintiff's petition (to which it is now held) and the evidence adduced to support it. In identical wording each petition alleged:

"5. That this proposed annexation and extension of boundaries is reasonable and necessary to the proper development of said City in that there is little space available within the confines of the present city limits to meet the demands for additional residence and business construction and in fact the area proposed to be annexed contains many homes and businesses and the said city furnishes its utilities to a great many of the homes and businesses located in the tract sought to be annexed. That many of the property owners in the tract to be annexed desire that they become a part of the city; that for the proper development, extension and construction of streets in the city and the proposed area, annexation should be perfected; that a large percentage of the land in the proposed annexed area is held for resale, not at regular farm prices, but for prices befitting town lots; that in fact part of the land so desired to be annexed has been platted for use as lots; that the proposed annexed area is part of the natural growth and development of the city and is contiguous and adjacent to the present boundaries of said City."

These allegations, if proved, are affirmative factors tending to establish the reasonableness of the proposed annexations. Dressel v. City of Crestwood, Mo.App., 257 S.W.2d 236, 248 [6]. (In the judicial determination of this question other factors or guides, not raised by the pleadings here or otherwise relevant, have been devised and followed by the courts. See, e. g., State ex inf. Major v. Kansas City, 233 Mo. 162, 134 S.W. 1007.) No one factor standing alone necessarily controls or is sufficient to prove that the reasonableness of an annexation is fairly debatable, but each factor, if relevant under the circumstances of the case, is to be considered in relation to the others. City of Aurora v. Empire District Electric Co., Mo.App., 354 S.W.2d 45, 48 [2–4]. Here, proof of the factors pleaded was lacking and the test of reasonableness was not met.

The City's petitions allege the depletion of space within its existing boundaries for° the City's proper residential and business development as the basis for the necessity for the proposed annexations. A city's necessity in this respect applies to present and to such future needs as are reasonably foreseeable, but not to needs

which are so remote and speculative as to be "visionary". City of Aurora v. Empire District Electric Co., 1. c. 48 [5]. The evidence shows neither present nor reasonably foreseeable future necessity for the proposed annexations. The absence of immediate need by the City for additional land was both conceded by its witnesses and otherwise established by the evidence. Leo Farnon, Cameron Realtor and president of its Chamber of Commerce, foresaw a need within the coming five years for land for residential and business development, while Erwin Nelson, the City Manager, thought it would be ten to fifteen years before the Stafford and Jones Tracts could be fully developed if annexed. There was some intimation that prior to the 1969 annexation because of a dearth of platted lots within the City of sufficient size for dwellings of contemporary design or of raw land suitable to such use, the development of the City was somehow retarded. The 1969 expansion, presumably undertaken to remedy that deficiency, brought into the City not only the platted Redbud and North Cameron Heights Subdivisions, but an additional 216 undeveloped acres. And although Redbud by then had been platted for almost four years and North Cameron Heights for eleven years, three-fourths of the lots of one remained vacant and unsold as did twenty of the fifty-nine lots of the other. Also, the 216 undeveloped acres, although suitable for about 400 commodious commercial or residential sites, remain unused for any purpose. Even before the 1969 annexation, however, there seems to have been a less than avid demand for serviceable homesites within the City. For instance, defendant Kenneth Stafford and his brother had marketed numerous such lots in 1965 and have not sold any since. Nineteen remain. From this, as well as from the lack of any convincing evidence of sales or even of lively interest in the purchase of City sites, we conclude there was no immediate need for expansion for residential development. In so concluding, we recognize that a city is not foreclosed from annexing adjacent territory simply

because undeveloped tracts remain within its present boundaries or because its citizens do not choose to build within certain of its areas. City of Ash Grove v. Davis, Mo.App., 418 S.W.2d 194, 205 [11–12]; State ex inf. Mallett ex rel. Womack v. City of Joplin, 332 Mo. 1193, 62 S.W.2d 393, 399. But here, there is no evidence that the 216 acres and other tracts within Cameron remain undeveloped because its citizens prefer to live in the areas proposed for annexation rather than in Cameron, but because there is no unusual demand by them for homesites whether within Cameron or beyond it. Thus, none of the Stafford Tract is platted for residences, from which we infer that a present demand for its use for that purpose is lacking. And while forty acres of the Jones Tract were platted in 1966, only five residential lots have been sold (the last of them in 1967) so that further development of the subdivision has been virtually abandoned as unprofitable.

A city's business expansion is an important factor in determining the necessity and ultimate reasonableness of an annexation. City of Rock Port v. Atchison County Co-op. Ass'n, Mo., 432 S.W.2d 317, 325 [1, 2]. The plaintiff has pleaded such a necessity, but has shown no present need. The only expansion of business activities to which the evidence specifically refers is that which has become imminent by the relocation by the National Brass Foundry Company and the extension of Ithaca Gun Company of their industrial operations to the City or its environs. In neither instance, however, was the use of land in the Stafford or Jones Tracts made or contemplated. National purchased a site within the City itself, while Ithaca located elsewhere outside the City's boundaries.

Plaintiff's evidence of some future use of the Stafford and Jones Tracts, particularly for homesites, as justification for the proposed annexations is no more convincing. Within the past year, witness Farnon detected a "trend of people moving towards Cameron" in the wake of incidents

of civil commotion in Kansas City, the location of the Kansas City Mid-Continent Airport (forty-five miles distant) whose employees were "all the time coming up", Hallmark's prospective operations (thirty-five miles away) and, in time to come, because of the operations of the recently established National Brass Foundry Company and Ithaca Gun Company. As proof of this "trend", realtor Farnon pointed to North Cameron Heights where "they have sold a lot of homes" and to the area around the schools, presumably the Redbud Subdivision just north of the Jones Tract, as much coveted for residential building. *In all this testimony there was not a single reference to any specific sale of a home or homesite in Cameron or the areas proposed for annexation to any person having been identified as borne there by the "trend".* To the contrary, both the testimony of Carl Johnson, a developer of the North Cameron Heights Subdivision and what we know of Redbud and Crestview Subdivision in the Jones Tract compel the conclusion that interest in those areas has been lethargic and sales infrequent. And while it is to be expected that Cameron as well as numerous other cities of the area similarly situated will be incidental beneficiaries of business operations and social unrest originating outside their borders, only by accepting as fact evidence obviously speculative may we conclude that such an influx of people and business activity are presaged for Cameron as to justify a reasonably foreseeable necessity for the annexations.

The essential hypothetical nature of the City's proof of necessity for expansion is further demonstrated by the City Manager's testimony that the Stafford and Jones Tracts were needed to accommodate an anticipated population growth of from 3000 to 4000 persons (virtually doubling the present 3965 population) within the next ten to fifteen years. Thus, an average annual influx of 250 persons is expected. In contrast, the actual growth in Cameron's population within the past twenty years (including about 95 persons taken in by annexations) was shown to have been at the rate of about 20 persons per year. The impetus for this projected growth presumably is to be found in those business and social factors described by Farnon and rejected by us, as inconclusive and speculative. In determining the necessity for annexation, the expansion and rate of growth of a city during the immediate past furnishes some criterion by which to judge the immediate future. Thus, a city's hope for the future must bear some reasonable relationship to the actualities of its past. Faris v. City of Caruthersville, Mo.App., 301 S.W.2d 63, 69; City of Ash Grove v. Davis, 418 S.W.2d 1. c. 206 [14–16]; City of Bourbon v. Miller, 420 S.W.2d 1. c. 303 [9]. Our review, as it has been throughout, is de novo, we make such findings and enter such judgment as are just and proper upon the whole record. Dressel v. City of Crestwood, 257 S.W.2d 1. c. 248 [2–4]. In this, we take the evidence as it has been presented, not as it might have been, or even as it was meant to be. In doing so, we find the evidence shows Cameron as a city which has experienced no remarkable growth either in population or in business activity. The two industries which have been attracted to the City by its enterprising efforts have already been located on other land so that the tracts proposed for annexation are not needed for that purpose. No other business expansion is shown by the evidence. The City has failed to demonstrate that the unexploited acreage annexed in 1969 and the sites for homes and businesses otherwise available within the existing City are not sufficient to its present and reasonably foreseeable future needs. It has failed to carry its burden of proving its pleaded necessity for the proposed annexations.

The other allegations pleaded relate to the reasonableness of the annexations, some co-related to the City's own necessity, others relating to benefits already conferred or to be conferred by the annexations. To begin with, the allegation that

"many of the property owners in the tract(s) to be annexed desire that they become part of the city" is totally unsupported in the evidence. In fact, those property owners who did testify, all defendants, were in agreement that they would not benefit from annexation and did not desire it. Neither was there any evidence that the annexation was necessary for the "proper development, extension and construction of streets in the city and the proposed area". The only municipal street development to which the evidence made reference was a modest program for curbing and guttering ten city blocks each year. There seemed to have been no plan to extend the City's streets either to the area annexed in 1969 or to the Stafford and Jones Tracts upon their annexation. Instead, it seems to have been the City's policy to await private development of the newly annexed areas and the consequent dedication to public use of permanently constructed streets.

A case of reasonableness justifying annexation is made out when it is shown that the land proposed for annexation is so situated as to be adaptable to urban purposes and is necessary or convenient to the reasonable exercise of city government. Dressel v. City of Crestwood, l. c. 249 [7]. Plaintiff concludes this is shown by evidence that part of the Jones Tract was platted and although the Stafford Tract was not, the value of the land in both tracts was in excess of that for agricultural land, which is to be reasonably explained by its adaptability for city uses, particularly since "(t)he numerous residences and businesses in each tract represent a natural growth of the City beyond its legal limits". See Jones v. City of Clayton, Mo.App., 7 S.W.2d 1022, 1024; Johnson v. Parkville, Mo.App., 269 S.W.2d 775, 777–778. On the evidence before it, the trial court found the proposed annexations unreasonable. He found no necessity for the Stafford Tract and a necessity for only that part of the Jones Tract already

platted and otherwise developed. We agree in these judgments denying both annexations. We also agree that where the evidence raises a fairly debatable question of the necessity and reasonableness of only a portion of an area sought to be annexed, but not as to all of it, that annexation fails. City of Aurora v. Empire District Electric Company, 354 S.W.2d l. c. 55 [7, 8]; City of Rock Port v. Atchison County Co-op. Ass'n., 432 S.W.2d l. c. 328 [3].

The evidence, most of it already noticed in detail, supports the conclusion that no part of the Stafford Tract and only the periphery of the Jones Tract are adaptable to urban purposes. While witness Farnon did testify that the Stafford and Jones lands were worth $1000 per acre—more than normally paid for agricultural land— this opinion was given in general terms, unelaborated and unsupported by any reference to specific sales or demand for either land at that price. That testimony was either rejected by the trial court or found insufficient as proof that the Stafford land was intended for city use. We also find it unconvincing particularly since no part of the Stafford Tract was platted or purchased with a view to urban development. As to the Jones Tract, the owners acknowledged that the lots along U.S. 69 and those fronting Park Avenue in the Crestview Subdivision sold for more than the $400 to $500 per acre value attributed by them to the balance of their tract. It was this area alone that the trial court found to be adaptable to urban uses. The westerly portions of the Jones Tract, however, are rough, not accessible by existing roads and retain their pastoral character.

While all the residents of both tracts save one have had the benefit of some city utility, water and sewer service have been available only to those who have had the resources to install lines to existing mains within the City. The cost of such services to those eventually occupying the outer reaches of both tracts, of course, would be particularly burdensome. That the City

has avowedly no immediate plans for the extension of its water and sewer lines or of streets into either tract is some evidence that it has not treated those areas as *de facto* extensions of its own territory. Nor, from what has already been shown, can it be said that the residents and businesses in each tract represent a natural growth of the City beyond its legal limits.

On consideration of all the evidence and the pleadings, we conclude plaintiff did not prove the necessity and reasonableness for the proposed annexations. Having failed to establish this statutory requirement, the annexations are per se unreasonable, and we need not consider the other statutory ground pleaded and contested. City of Bourbon v. Miller, 420 S.W.2d 1. c. 303 [10].

In having so concluded, we have taken into account that one of the admitted purposes for the proposed annexations was to make the boundaries of the City more regular. This is one legitimate end, among many, of municipal expansion. Ozier v. City of Sheldon, Mo.App., 218 S.W.2d 133, 137 [3–5]. However, another admitted objective of the annexation of the Jones Tract was to bring the City's boundaries in contiguity to Burlington Reservoir, a source of its water supply, so that the reservoir itself could then be subject to annexation. In following that course, the City seems to have been heedless of the almost total lack of benefit its presence could confer on any but the peripheral occupants of that tract.

It has been said that "(a)nnexation should be infrequent and the city should be permitted to make reasonable provision for the foreseeable future". City of Rock Port v. Atchison County Co-op. Ass'n., 432 S. W.2d 1. c. 325 [1, 2]. Cameron seems to have made such provision by its 1969 annexation.

The judgments are affirmed.

All concur.