**CITY OF LAWSON, Missouri, Respondent,**

v.

**Vester CATES et al., Appellants.**

**No. 25991.**

Missouri Court of Appeals,
Kansas City District.

Sept. 7, 1972.

Roger Guy Burnett, Liberty, for appellants.

A. V. McCalley, Richmond, for respondent; McCalley & Calvin, Richmond, of counsel.

PRITCHARD, Judge.

The trial court granted annexation of 680 acres of land to the City of Lawson which had at the time of trial a population of 1,092 persons and an acreage within its boundaries of 462. The 680 acres proposed to be annexed lies immediately to the west of the city and is between it and U. S. Highway 69. The sole issue is whether under the Sawyers Act, Section 71.015, RSMo 1969, V.A.M.S., the city's resolution of annexation of the area of March 25, 1971, is, under the evidence, reasonable and necessary to a proper development of the city. The burden of proof upon this issue lies with the city. City of Ash Grove v. Davis, Mo.App., 418 S.W.2d 194, 196.

The city's evidence is this: Steven E. Nolker, president of the city's Board of Aldermen, testified that the population of Lawson was in 1950, 486 persons; in 1970, 1015 persons; and in May, 1971, was 1092 persons. The percentage of population increase was greater between 1950 and 1960 than from 1960 to 1970 because the Nike base east of the city was closed and 20 new homes became unoccupied in the latter period. The personal property tax valuation was $78,415.00 in 1950, and $225,915.00 in 1970. The merchant's tax valuation was $12,950.00 in 1950, and $32,350.00 in 1970. The city is located 3½ to 4 miles north of Excelsior Springs and one mile east of U. S. Highway 69. The city has a state approved water system (a lake with a purification or water treatment plant) which was first installed in 1955 and which was considerably improved in 1965. In 1965 a sewer system was put in with a lagoon in the southeast corner of the city. Natural gas is provided by the Gas Service Company. In 1968 a new fire truck was purchased, and the city still has the old pumper which is in good condition. A rural fire truck is available to the city as needed, and the same volunteer fire fighters serve both the city's department and the rural department. The city owns a police car and employs a full-time police officer and one deputy. In 1970 a new city hall and a fire station were built, and new equipment for the fire station was provided. Instead of just oiling streets, they are surfaced with black asphalt and chips, and half the streets are done each year, and the streets are in good condition. Two years ago, a new Wayne street sweeper was purchased at a cost of $12,000.00. The city owns its backhoe equipment, a tractor and mowers, and a truck. There are two full-time employees taking care of streets, the water system and sewers. All city residents have water and sewer services available, with only 3 to 5 homes presently not being connected to the sewer system.

The city has adopted zoning and subdivision regulations, and building, fire, plumb-

ing, wiring and electrical codes, and recently, Model Traffic Ordinance for Missouri Municipalities was adopted. In 1965, a comprehensive plan—a guide for future development of the city, was adopted. In the last month (before trial) approval of a loan for housing the elderly in the amount of $375,000.00 was obtained. A few years ago the city won a $1,000.00 prize, offered by the Missouri Community Betterment Program. After utilities were had the city worked with the Missouri Division of Commerce and Industry to attract industry to Lawson. The city was advised many times that if it was going to attract industry in any great amount proper land would have to be provided. The city has not had an ideal location for industry even though it had the railroads, highways and utilities. The city has, however, obtained two new industries in the last three years—J & C Colors (which mixes and blends paint for various plastic plants) and the Ayres Plastic plant which leased the old, abandoned Nike base 1½ miles east of the city. The city purchased the Nike base which has a city water line to it.

The reasons which Mr. Nolker gave for proposing the area to be annexed are these: There are no large tracts of land available in the present city limits for industry; the proposed area is ideal because of there being three railroads and good roads; and since 1965 when the present sewer system was put in, the population has grown very fast and the present east side lagoon is up to capacity; a new lagoon could be built on an 80 acre tract north of Highway D., the low spot for the whole area which would drain approximately 2,000 acres into the one spot, and which lagoon would eliminate two sewer lifts of the city's present lagoon, thus taking a load off of it.

There are two subdivision areas in the area proposed to be annexed: Denton's subdivision and another unplatted one, both being served by natural gas and unlimited water from Rural Water District No. 1. If the annexation is approved the city plans to call a bond issue election and immediately to put sewers and a lagoon in the area at an engineer's estimated cost of $207,609.06. The cash on hand of the city is $94,665.00; and its present indebtedness is $194,000.00, of which $88,000.00 are revenue bonds. The assessed valuation of all property in the city in 1970 was $1,423,252.-00, and in the area proposed to be annexed it was $191,444.00, making a total of $1,614,696.00, which would give an additional bonding capacity of $128,939.30. It is expected that 80% of the sewerage system costs would be financed through state and federal aid.

Water and natural gas are already in the area. Immediate fire and police protection could be given. Street lights could probably be made available, and the city could start taking care of streets and roads, having the equipment and money to do it.

On cross-examination it was elicited from Mr. Nolker that the area proposed to be annexed is presently zoned for agriculture and would have to be rezoned. There has been no commercial development in the last 10 years. There are 8 or 9 homes in Denton subdivision, all but 4 having been built in the last four years. The J & C Color company occupies 4,000 square feet and has 5 employees, including its salesman. The Ayres Plastic plant, on 18 acres, employs about 10 persons. Its plant cost $120,000.00 and is financed with industrial bonds under a 15 year lease. In 1971 the city had 400 water meters, and has a zoning ordinance limiting three families to an acre. There are no medical doctors in the city. Dr. Baldwin and his partner in the north part of Excelsior Springs serve the city, and there is a part-time doctor of osteopathy in the city. There is no dentist in the city. The one blacksmith moved his shop to his home north of the city. There is one Allis-Chalmers dealer, one funeral home, one grocery store, one appliance store, and one operating garage. There is a Merchant's Association instead of a Chamber of Commerce. No particular size industry was considered with re-

spect to water and sewerage needs, but a study, about half finished, is being made for such needs by Urban Programming Corporation of America, St. Louis, Missouri [UPC] under contract with the persons developing the industrial park. The area proposed to be annexed is served by both R.E.A. and the Missouri Power and Light Company, and the rural water line is six inches in diameter.

Real estate developer and investor, Keith Chasteen, has a contractual interest in 501 acres in the area proposed to be annexed which is planned to be the industrial park. Mr. A. V. McCalley and his wife are the fee simple owners of this land and are joint venturers with Mr. Chasteen in its development. According to Mr. Chasteen, the new development will be "one of the finest industrial parks in the country." UPC is making a complete land use study and analysis—a market and labor study and a feasibility report. Mr. Chasteen feels that the area is a very unique piece of property, served by three different railroads, two highways and an International airport (for air freight) 30 minutes away. He wants the city to annex the area because he feels Lawson is a growing community and he would have its cooperation, he would have fire and police protection, and he would get more cooperation on utilities. The development of the industrial park does not depend upon its being annexed to the city. Mr. Chasteen has not sold, and will not sell any parcel of land in the area until it is completely planned. The studies of UPC are yet incomplete.

Don Roberts, an investment banker in municipal bonds, has been acquainted with the city since 1956 as its financial advisor. The city's bonding capacity, together with funds on hand, is more than adequate to finance the $207,609.06 sewer and lagoon construction cost. Additional sewer revenue bonds ($30,000.00 needed) would be on a "parity equal in lien" with present outstanding water and sewer revenue bonds, which would make them marketable at a

better, lower rate of interest. For his computations, Mr. Roberts used up all the city's general obligation bonding capacity in order to generate enough funds to build the sewer. No increase in rates was anticipated by him because the earnings of the water and sewer system have been sufficient to pay off the indebtedness.

Larry Swearengen is chairman of the city's zoning board. He testified that within the city limits there is no land available for industrial development. The reason he gave for annexing the land in the area so proposed is to provide an orderly, thoughtful growth for the city, "it's obvious that there's need for an industrial area. It would be certainly unbalanced if there were not some area or some environment created for industrial use." It would be the function of the board, if the city were granted the right to annex, to consider street designs, and all the various designs of the usage of the land in the area.

James Gorham, William R. Morrow, Lawrence D. Estill, Fred Evens, Walter Nolker and John Bryant all own various tracts in the area proposed to be annexed. Their testimony generally was that even though more taxes would be paid to the city, if it provided sewerage facilities, police and fire protection, values of their properties would be increased. Robert Shearer, a real estate broker, is acquainted with all available lots in Lawson for subdivision development. A map in evidence shows 177.2 acres of vacant land. Although much of Mr. Shearer's testimony was hearsay in nature and need not be considered, it is fairly deducible that much of the 177.2 acres is not available or suitable for subdivisions.

There are presently septic tanks serving the 62 people and 18 houses in the area proposed to be annexed. The water supply from the rural district comes from Excelsior Springs and is unlimited. The city will not furnish streets to the area but will require developers to construct them. The city has no health officer, and the area

proposed to be annexed is serviced by the Clay County Health Officer and its department, which is not accessible to the city. Clay County has stringent zoning and building regulations for the area. Trunk sewer lines only will be provided by the city, and developers will be required to put in other sewer line connections.

Appellants' position is that the factual proof of the reasonableness and necessity of a large 500 acre industrial park within Lawson is non-existent. It is argued that "The evidence as to prospective growth is void of any prospects of there being any industry desiring or willing to move into the proposed area of annexation"; that the developer (Chasteen) of the proposed industrial park had not even contacted any industry about buying or leasing the land, and there were no plants under construction or plans completed for any plants to move into the area. It is true, in the respects mentioned, that there was no evidence of present occupancy by industry of the industrial park. That, however, is not conclusive against the city, nor is the lack of such evidence the only factor to be considered as to the reasonableness and necessity of the proposed annexation. Contrary to appellants' contentions and argument, the city is not dying on the vine. While there was evidence that some businesses had been lost, and some professional persons had left in years past, yet the population had more than doubled in the past twenty years, despite the fact that some loss was occasioned by the abandonment of the Nike base in the last decade. It is clear that the city is in excellent financial condition, with a cash balance on hand in excess of $94,000.00. It has been furnishing police and fire protection to its inhabitants; water and sewerage facilities have been installed and improved; and, under the evidence, there is no question but that all these services are capable immediately of being extended to the proposed area of annexation, including sewerage facilities adequate to serve the entire 680 acres in a similar manner to the present sewerage facilities within the present city limits. The requirement under the Sawyers Act, supra, of ability to furnish normal municipal services of the city to the unincorporated area within a reasonable time is shown by the foregoing evidence, and that showing is a benefit to the area to be annexed. "The comparative benefits and detriments to both the City and area to be annexed, therefore, are considerations in any judicial determination of the reasonableness of an annexation." City of Cameron v. Stafford, Mo.App., 466 S.W.2d 115, 120. In this connection, with respect to a benefit of the city, the evidence is that by construction of the trunk sewers and the lagoon in the annexation area, two expensive-to-operate lift stations in the city's present sewer system will be eliminated, and the system now being operated to capacity, will have a load taken off of it. There are other benefits, not only to the city, but to the surrounding areas and communities. If the 501 acre proposed industrial park goes on to successful completion and occupation by industry, as the evidence of ideal suitability for that usage definitely shows, there will be employment of persons in the city and without. In all likelihood there will be an increase of population in the entire area, with concomitant other new businesses, and the economic growth and welfare of the city and its inhabitants will be enhanced. This prospect is in accordance with the present public policy of the state as set forth in St. Louis County v. Village of Champ, Banc Mo., 438 S.W.2d 205, 213, "As shown by the amendments of Art. VI, § 27, 1945 Constitution and the enactment of §§ 100.010–200, supra, and public policy of the state now favors more ambitious industrial development by municipalities." It is noted that the City of Lawson, according to this record, is not itself seeking to construct an industrial site and buildings. That will be done by Mr. Chasteen and his associates, but the result may be the same and be within the foregoing quotation from the Village of Champ case. It is of no conse-

quence that no specific industries are actually and definitely ascertained which will come to the area. The strong possibility of their being attracted to the ideal industrial park area is the factor to be considered in this case. "Recognizing that ' * * * new laws and modern economic and social trends must be taken into consideration * * * *', Olivette I, supra [City of Olivette v. Graeler, Mo.], 338 S.W.2d [827] 1. c. 837, and acknowledging the above mentioned change in public policy, it follows that consideration of whether the proposed annexation is 'necessary [or perhaps we should say likely] to foster growth and prosperity' of the annexing city is now entitled to greater weight than it has previously received * * *."

Appellants rely upon the first Village of Champ case, State ex inf. Eagleton v. Champ, Banc Mo., 393 S.W.2d 516. There, with a population of less than 16, Champ was seeking to annex 3,100 acres for a vast industrial complex. There had been *no* development within Champ since its date of incorporation. Champ had levied no taxes, had no income, and made no village expenditures. The Special Commissioner, whose findings were affirmed and whose recommendations were accepted by the court, found that Champ was not equipped to supply any services to the annexed area, and that the extension of its boundaries was not for any valid purpose. The facts here contrarily show that Lawson is a vigorous, forward-looking, financially sound and enterprising city, concerned with its future as a municipality, and that as such it has a direct interest in annexing the proposed area. There was no evidence of substantial growth of the city in City of Ash Grove v. Davis, Mo. App., 418 S.W.2d 194, which is here present. In City of Houston v. Duff, Mo. App., 338 S.W.2d 373, the city desired additional land for building sites, but the evidence showed a low density of persons within the city, hence the annexation was denied because of lack of need. Here, the

city needs the area for industrial development (there being practically no land available therefor within the city) and for homes. All of appellants' cited cases are distinguishable.

The trial court's findings, here paraphrased as to the essential elements of reasonableness of and necessity for the proposed annexation, is supported by the evidence: The area consists of 4 tracts of land, 30 acres, 40 acres, 80 acres and 501 acres. The owners of the latter tract are presently developing it as Lawson International Industrial Park which is served by 3 railroads, U. S. Highway No. 69, Kansas City International Airport, water, natural gas and electricity. The 30 and 40 acre tracts will open to subdivision and development as soon as an approved sewerage system is available. The natural growth of the city, particularly for industry, is most likely to be to the west to U. S. Highway 69. The city is properly zoned, and much of its industrial land is presently occupied. Development of the area sought to be annexed is seriously hampered by lack of an approved sewerage system which Clay County Zoning Regulations require for any type of extended development. The city's sewerage system is operating near full capacity, and it is necessary that it be extended into the proposed annexation area to serve the existing city, which extension will adequately provide an approved system for the entire area. The city is in sound financial condition. Its water system is approved by the state and is adequate to serve an additional 900 persons. The city has a fire department adequate to serve it and the area to be annexed, and has necessary equipment and manpower to maintain all streets in both areas. Police protection, fire protection, street lights, water and street maintenance would immediately be provided. In short, "The City's legislative decision that the proposed annexation was necessary and reasonable can be judicially nullified only if that decision is so lacking in evidentiary support that the issue was

not fairly debatable and thus showed an abuse of legislative power." City of Creve Coeur v. Brame, Mo.App., 446 S.W.2d 173, 175[1].

The judgment is affirmed.

All concur.