**CITY OF BUTLER, Missouri, Respondent,**

v.

**Fredolin O. BOCK et al., Appellants.**

**No. 25970.**

Missouri Court of Appeals,
Kansas City District.

March 5, 1973.

E. J. Murphy, Butler, for appellants.

Harold A. Kyser, Belisle, McNabb & Kyser, Butler, for respondent.

Before SHANGLER, C. J., PRITCHARD and WASSERSTROM, JJ. and ROBERT G. RUSSELL, Special Judge.

PRITCHARD, Judge.

The City of Butler, Missouri, was successful in securing a declaratory judgment that its action in annexing some 3,118 acres of land surrounding its present city limits (containing 1,438 acres of land) was reasonable and necessary to its proper development; and that it had shown its ability to furnish within a reasonable time its normal municipal services to the area sought to be annexed. In the light of the evidence these are the issues to be examined under the Sawyers Act, Section 71.-015, RSMo.1969, V.A.M.S.

At the time the original petition was filed, May 6, 1970, Butler had a population of 3,984 persons according to the judicially known United States Census for 1970. In 1960, its population was 3,791, and there were estimates in evidence that in 1965 its population was 4,059 and in 1967, 4,144. It is apparent that the actual increase was 193 persons for the ten year period.

The City says in its brief, "There is no vacant land in the present City." There is no testimony in the record which would even tend to support such a statement. The 1968 document containing the Comprehensive Plan for Butler, prepared by Howard, Needles, Tammen & Bergendoff, recites as to existing land use, "In 1967, only one-half, or 788, of the total 1,438 acres

within the Butler corporate limits was developed." This refutes the City's statement in its brief. There is no showing of what kind of vacant land the 788 undeveloped acres is, or to what uses it might be put. It is thus a reasonable conclusion that Butler is not spilling over its boundaries in population or business growth, or that it needs any more area for use of any type, which is sometimes said to be a factor for consideration in annexation cases. Williams v. City of Illmo, Mo.App., 279 S.W.2d 196, 202[1, 2]; and compare City of Cameron v. Stafford, Mo.App., 466 S. W.2d 115, 121[7].

The area here proposed to be annexed lies to the north of Butler along old U.S. Highway 71 and new U.S. Highway 71 (a four-lane divided and very limited access highway leading to Kansas City, Missouri) and generally between them; to the west of the new Highway 71 interchange and beyond it in an approximate square area of about 160 acres; and to the southwest, south, and to the southeast. Appellants concede that the present boundaries of Butler are irregular, and that the annexation would serve the function of squaring up the boundaries, at least on the north, west and south sides of the City.

According to Bill D. McGuire, an abstractor who prepared the legal description of the areas to be annexed, there will be 8¾ miles of existing roadways therein which the City will be required to maintain. There are five existing platted subdivisions in the area, three of which were recorded after this suit was begun, but at the time of trial there were only ten houses erected in these subdivisions. He acknowledged that 98% of the area consists of agricultural land.

As to fire protection, Fire Chief Richard Leavitt testified that the City has one full-time fireman besides himself, and that the eleven others are volunteers. It has a 1951 model fire truck and a rural 1946 fire truck and a Jeep equipped for pasture fires. His conclusion was that the City is able to furnish fire service to the area proposed to be annexed; it is presently serving a ten mile radius around Butler; and there would be no additional service to be furnished. On cross-examination he testified that the people in the area were not going to gain anything except elimination of a member $10.00 annual service charge. He has not asked the City to provide additional firemen although they are needed. He has asked for four years, but did not get it. The fire department annual budget is $5,000.00 to $8,000.00. Chief Leavitt could not recall a major fire in Butler since 1968.

Chief of Police, Roy Simpson, testified that the City has six regular patrolmen and five auxiliaries. He saw no problem with adequate police protection in the area proposed to be annexed, but acknowledged on cross-examination that there were no particularly troublesome areas in the immediate vicinity of Butler.

Mrs. Clotiene Bartley, City Clerk, testified that the City has built a new municipal park with a swimming pool, has improved North Field, J. C. Park, and has added to the ball parks. The City has plans for a new park in its eastern part. Mr. Charlie Ott donated the land, around 10 acres, and $25,000.00 cash for the new municipal park.

Frank Fritts, Superintendent of Utilities, testified that with present facilities (six Fairbanks-Morse generators) and a tie-in with Osage Valley Cooperative (REA), electrical power is unlimited. The water plant, which is supplied from a lake and the Marais Des Cynes river seven miles south, with a million gallons a day now used, is unlimited. The City has the capacity to supply electrical power to the area to be annexed, to service its 8¾ miles of streets. The City hired Larkin and Associates to run a sewer and water survey, but they had not returned a report. On cross-examination, Mr. Fritts testified that the uses of power has gone up throughout the years by reason of air con-

ditioning; the six generators are insufficient to supply Butler's needs; the area outside the City is served by the REA cooperative; and the City would not acquire any new customers from the area to be annexed because Osage Valley already services them, and some of them are served by a rural water district, although some are on city lines. The City is capable of maintaining streets inside its limits "as fast as machinery and men can do it," but at the present time (trial) the streets were very much in need of repair, and in the last year the City spent 45% of its street funds. In the area proposed to be annexed, the City will not supply any new streets, the subdivisions would do that, but the City would supply maintenance. As to sewers within the City, the airport area to the north is not on a sewer, nor is the area north from Summit Street except for the Lens plant. West of West Street on to the west, there are no persons on the sewer, but over to West Street from Prospect Drive, all persons are on the sewer except two trailer houses which are lower than the sewer. On Sunset Drive some homes are not on the sewer, and 6 or 10 homes in that area have septic tanks. Some areas to the south are not on sewers as are quite a few homes in the northeast. It might be that 30% of the City's inhabitants are not on sewers. Mr. Fritts did not know whether the City could supply normal sewers to the proposed area to be annexed.

Marvin Compton, who was in charge of the real estate department of the Skelly Oil Company, testified that it had bought land in the northeast quadrant of new U.S. Highway 71 and Highway 52, to develop a facility to sell petroleum products. Skelly had no objection to the annexation. The only other businesses now being operated outside the present city limits are south along old Highway 71: Lola's Steak House, a beer distributing company, an implement company, and the Coronet Aluminum Company which is part of Butler Industrial Development.

David Owsley, who had been with Larkin and Associates, Consulting Engineers, in Kansas City for 9 years, testified that it had a contract with the City to conduct a sewer survey, to study present facilities and future sewage treatment needs, and to recommend staged construction to serve the existing City and the surrounding areas. Larkin has done very little on the project at the present time, but Mr. Owsley thought it was feasible for the City to serve all the areas. It would cost somewhere around $8.50 to $9.00 per foot to install sewers, including manholes, and lift stations would cost from $5,000.00 to $20,000.00 each.

Donald Woodard is a City Planner, so employed by Kansas City, Missouri. He was employed by the City in 1968 to develop a comprehensive plan, which is a document of some 127 pages with plats and plates showing desirable uses of land and its control for the future to 1990. Mr. Woodard expected to witness urbanised development in all the areas proposed to be annexed: to the north, industrially, because of its location with respect to the airport, the remainder of the community and particularly the railroad; the area to the northeast would be both industrial and residential development; he expected the west area at the new U.S. Highway 71 interchange to be occupied by persons seeking survival from their businesses along old Highway 71; he expected the area to the southwest to be basically two types of development—light industrial (low nuisance type) and residential, probably in the higher density category; and the area to the southeast would have additional residential and recreational development. Mr. Woodard thought, as his opinion, that it was necessary to annex the area for the future growth and development of Butler, and if the area was not annexed, the first effect would be the fact that urbanization would take place around the perimeter of the City which is not under its jurisdiction but which is dependent upon it for public

facilities, such as parks, highways, and commercial (etc.). Mr. Woodard thought also that there would be uncoordinated growth which would take place without the benefit of the protection of zoning and subdivision regulations for building and housing codes.

On cross-examination, Mr. Woodard acknowledged that the public would have to build streets in newly platted subdivisions (some of which were recorded after this suit was begun). He was aware that there were unsewered areas within the City which could be resolved by the addition of lift stations. Many streets in Butler were in bad condition which he opined was the result of original poor construction, rather than the maintenance. As to when the area sought to be annexed would be provided normal city services, Mr. Woodard considered the designed 20 year plan, assumed development would take place within that time periodically, and as it takes place, "the services will be provided as the City is able to provide the services then new opportunity for development will be presented and those areas will then be further encouraged to have additional development."

Mayor Maurice S. Solomon concluded that the City could furnish the services which would be required. "I think most of the services are already being furnished, but the other services, there are lots of things that would enter into when they might be furnished." He referenced acquisition of rights of way for water lines, shortage of materials, Federal grants, and thought, "If we are going to progress in an orderly fashion, I think we have to have some type of control over the order in which annexation is carried out." As to sewers, Mayor Solomon testified that Federal money would be available, and that Larkin and Associates were working on a plan, after which the City would write the Public Health Service and tell them $1,000,000 was needed to build the sewer system out there. Butler would be in a financial position to supply normal sewer

services within 5 years, and the Federal Government would provide 70% and the City 30% of the funding. Some street funds would be gotten from the Federal Government, some from the state, and some from the local area, "all within five years."

In shouldering its burden of proof (City of Mexico v. Hodges et al., Mo.App., 482 S.W.2d 545, 547[1]) to show the necessity and reasonableness of its proposed annexation under the Sawyers Act, what the City has shown by the foregoing evidence, are its hopes, aspirations and great expectations. None of these are reduced to any concrete factual bases of even a probability or a likelihood that the agricultural areas, as now used, would be put to other uses either residential or industrial. There is no showing that any industry had any plan, or a commitment conditioned upon the annexation being granted, to settle in the area. There is no evidence that the Federal or State governments have become committed, again even conditionally, to aid in whatever might be needed by the City to expand its normal municipal services into the area. Lacking is the reasonable likelihood of industry using the area (or even any benefit to the City or the area to be annexed) as was present in City of Lawson v. Cates, Mo.App., 485 S.W.2d 146. As above noted, there is no evidence that the City's population is being extended beyond its boundaries, cf. City of Houston v. Duff, Mo.App., 338 S.W.2d 373, and the evidence is that there has been no substantial growth of the City, either in population or by the acquisition of new industries. City of Ash Grove v. Davis, Mo. App., 418 S.W.2d 194. The history of the City in this latter respect is certainly an important element in considering planning for the future, because " * * * what is reasonable for the future should be judged chiefly from the known and existing facts." City of Bourbon v. Miller, Mo., 420 S. W.2d 296, 303. The only thing that is present in evidence here is the City's desire to control by zoning whatever might be or possibly be the development into other uses

of this largely agricultural area. This is all the tangible benefit that is shown to the residents and owners of the area proposed to be annexed. The comprehensive plan of 1968 is excellent in its scope, but there is lacking any concrete foundation that its provisions would ever come into being for the City, and the prognosis for actual development of the City pursuant to its recommendations, therefore, rests entirely in speculation. For analogous cases on the basic propositions here presented, see City of Richmond v. Harmon, Mo.App., 468 S. W.2d 682; and City of Cameron v. Stafford, Mo.App., 466 S.W.2d 115.

The judgment is reversed.

All concur.

CROSS, J., not participating.