**CITY OF TOWN AND COUNTRY,**
Respondent,

v.

**ST. LOUIS COUNTY, et al.,**
Intervenors-Appellants.

No. 64430.

Supreme Court of Missouri,
En Banc.

Sept. 20, 1983.
Rehearing Denied Oct. 18, 1983.

Thomas W. Wehrle, Andrew J. Minardi, Cynthia Garnholz, Clayton, Mark R. Gale, Michael E. Wilson, Greensfelder, Hemker, Wiese, Gale & Chappelon, St. Louis, Albert A. Michenfelder, Ziercher, Hocker, Human, Michenfelder, Nations & Jones, Clayton, Steven W. Koslovsky, Ziercher, Hocker, Human, Michenfelder, Nations & Jones, Clayton, Albert H. Hamel, Lashly, Caruthers, Baer & Hamel, St. Louis, Donald Stohr, Thompson & Mitchell, St. Louis, for intervenors-appellants.

Shulamith Simon, Husch, Eppenberger, Donohue, Elson & Cornfeld, St. Louis, for respondent.

John E. Bardgett, Guilfoil, Petzall & Shoemake, St. Louis, for amici curiae.

HIGGINS, Judge.

The City of Town and Country, Missouri, sought to annex three contiguous parcels of land adjacent to that city. In an appropriate declaratory judgment action brought subsequent to the statutorily required "referendums" of residents in affected areas, the trial court entered a judgment which approved the annexations. The Court of Appeals reversed on a rationale attributed to the *Graeler* cases. *City of Olivette v. Graeler*, 338 S.W.2d 827 (Mo.1960), "*Graeler I*". *City of Olivette v. Graeler*, 369 S.W.2d 85 (Mo.1963), "*Graeler II*". The case was transferred by this Court to determine the present vitality of the *Graeler* cases, given subsequent legislative enactments concerning annexation proceedings. §§ 71.015, 71.-870, RSMo 1978. The Court determines that these statutes have altered application of the holding of the *Graeler* cases. Under the scope and standard of judicial review applicable to this annexation proceeding, the annexations are valid, and the decision of the trial court is affirmed.

All appellants assert in some fashion that the trial court erred by failure to consider

the interests of St. Louis County as a whole, either through failure to consider adequately the nature and extent of governmental and residential services offered by the County and City of Town and Country, respectively, or because of its determination that the City had demonstrated that the reasonableness of the annexation was fairly debatable.

The trial court's findings of fact arise from a voluminous record. They are uncontested on appeal and, paraphrased as follows, suffice to state this case.

The City of Town and Country is a municipal corporation organized and existing under the laws of the State of Missouri as a City of the fourth class in St. Louis County, Missouri. On February 24, 1977, it adopted resolutions declaring its desire to annex the property designated in each resolution and scheduling an election to be held on the proposal to annex on April 5, 1977. Certified copies of the resolutions were delivered to the St. Louis County Council and Board of Election Commissioners of St. Louis County on February 25, 1977.

Notices of the election on each annexation proposition and on each proposition concerning the furnishing of fire protection, as provided in section 321.650, RSMo 1978, within each of the areas proposed for annexation were duly published. Ballot forms in accordance with the applicable statutory provisions were provided for such elections. The question of annexation received favorable majorities in the annexing City and in each of the unincorporated areas sought to be annexed.

The existing city limits of the City are adjacent to each of the parcels proposed for annexation. In its selection of defendants as representatives of the class of inhabitants of each unincorporated area, the City took into consideration the diverse interests, in terms of land use, nature of development, size, geographical location and position on the annexation proposition.

Police, fire and ambulance services are provided by and through the Department of Public Safety of the City of Town and Country. As of the commencement of trial, the Department consisted of a thirteen man staff. An additional officer had been hired and was scheduled to start January 24, 1979. The Chief has training in both police and fire functions. Each of the officers of the Department has had experience and training in police and fire protection. The City has a mutual aid contract for fire protection with all municipal fire departments and fire protection districts within St. Louis County. It also has a mutual aid contract with all municipalities in St. Louis County and the City of St. Louis for cooperative police services. The City utilizes the I.D. and laboratory facilities of the County Police Department. The Department has two fire pumpers, one 1500 g.p.m. and one 750 g.p.m., both equipped with standard fire and life saving equipment. It has two marked police vehicles containing various items of police and emergency equipment and a third unmarked vehicle which is used by the Chief. Ambulance service is provided through an arrangement with the City of Des Peres and the Creve Coeur Fire Protection District. The City also has access to the county-wide ambulance facility. For 1979, the City provided the sum of $39,000.00 in its budget for the funding of a contract for ambulance services. The City presently provides police and fire protection service to the Village of Country Life Acres and to the City of Crystal Lake Park under contract. The City was also providing by contract fire protection to the Principia area of Parcel 1, bounded by the existing city limits, Highway 40, Mason Road and Clayton Road.

The City maintains the public roads within its city limits, Clayton Road east of Ballas, Topping, Barrett Station and Bopp Roads. The balance of Clayton Road, west of Ballas, Ballas Road, Highway 270 and Highway 40 are state maintained. On the public roads maintained by the City, the City provides snow and ice removal, street signs, weed control and repair and improvement work. The City also provides snow and ice removal on private streets and street signs at the intersections of the pri-

vate roads and major streets for public safety purposes.

The City has a zoning ordinance and a subdivision ordinance which it administers throughout the City. The City has a Planning and Zoning Commission which makes recommendations to the Board of Aldermen on applications for rezonings and special permits and performs functions designated for it under the zoning ordinance. In the administration of the subdivision ordinance, the Commission reviews preliminary and final plats and has the assistance of the City's consulting engineer who reviews plats and subdivision improvement plans. The City has a Board of Adjustment which has jurisdiction over appeals from actions of the Building Commissioner and requests for variances under the zoning ordinance.

The City has a building code, which incorporates the 1975 BOCA Codes, including the Basic Building Code, Basic Fire Protection Code and Basic Mechanical Code. The Building Code is administered by the Building Commissioner of the City of Town and Country. Building plans are also reviewed by the fire marshal of the City. The City has adopted as its codes the electrical, plumbing and elevator codes of St. Louis County. The City has a contract with St. Louis County for the administration of such ordinances by the St. Louis County Department of Public Works.

The City has contracts with St. Louis County for mosquito control, rabies control, septic tank and food inspection and general health services. The City has an advisory Health Commissioner for liaison with the County Health Department.

The City has a contract with St. Louis County for property tax collection. The City maintains its records, issues licenses and permits as required under its ordinances.

The major portion of the City has been developed for single family residential purposes. The City contains a number of institutional uses, a hospital, public and private schools and churches. Various public utility facilities are located within City, including a water tower of St. Louis County Water

Company and a Union Electric Substation. Facilities of the State Highway Department are also located within Town and Country. There are several private recreational facilities located within the City, a golf course, racquet club, and private subdivision facilities. The commercial uses within the City are primarily contained in several office buildings, at the Ballas-Highway 40 intersection and at the northwest corner of Clayton and Ballas. Various retail and service facilities are located within these buildings. There are commercial uses on the remaining corners of the Clayton-Ballas intersection.

Town and Country was originally incorporated in 1950 as a village, comprising 748 acres. Since its original incorporation, it has perfected two annexations during the 1950s. As a result of such annexations, the size of the City has grown to 2,670 acres. The City's assessed valuation has grown from $576,356.00 in 1950 to $24,855,646.00 in 1978. The City's population in 1950 was 162. The 1960 and 1970 census indicated growth to populations of 1,440 and 2,645. The population ranges for the City as of early 1977 were 2,730 (County witness) and 3,215 (City estimate). These population estimates did not include the population from the additional homes constructed in 1977 and 1978. As of December 31, 1978, the City had a cash balance of $153,905.36. This sum included the sum of $30,733.11, representing taxes collected for expenditure in 1979. As of December 31, 1978, the City had accounts payable of $23,026.55 and a payroll tax liability of $4,591.65.

Certain residents of the unincorporated area adjacent to the City requested they be annexed, and a committee was appointed by the mayor of Town and Country to study their proposal. This committee, the Ad Hoc Committee on Annexation, investigated general information concerning the possible areas for annexation, studied the possible governmental structure of an expanded city, reviewed the matter of extension of the City's municipal services to the possible annexation areas and evaluated the financial aspects of an annexation. During the

period that the possibility of annexation was being considered, the City retained R.W. Booker & Associates to advise the Ad Hoc Committee concerning the possible annexation. Representatives of this firm reviewed the boundaries of the proposed annexation area and advised the City concerning the matter of boundaries. Representatives of the Ad Hoc Committee on Annexation made reports to the Board of Aldermen at a special meeting held on January 18, 1977. At such meeting, the Board of Aldermen determined to proceed with annexation and fixed the boundaries of the annexation areas. The Board made a decision to present the annexation in three parcels.

The City has plans for the extension of its normal municipal services to each of the annexation areas within a reasonable time after the effective date of annexation. The Board of Aldermen has approved the Organization Plan for Police, Fire and Ambulance Services After Annexation. Phase I is for the period commencing immediately on the effective date of the annexations. Under Phase I, the present Department of Public Safety will be divided into separate police and fire departments, with the police department to consist of twelve persons, including the Chief, police officers and a clerk. One additional patrol car will be acquired. The Police Department will operate out of a trailer to be located on the grounds of the existing municipal building. The Fire Department will have fourteen fire fighters and a Chief and will operate out of that portion of the existing municipal building which presently houses the Department of Public Safety. Under Phase I, there will be 24 hour protection consisting of four firemen on the pumper and two police officers patrolling at all times. The City plans to enter into a contract for the provision of ambulance services within the annexed areas. Immediately upon annexation, the City will take over responsibility for all roads within the annexed areas which are maintained by St. Louis County, except for Mason Road and any other road which is on the County Arterial Road System. The services will include all those which are presently being provided by the

City for public roads within the existing City. The City's zoning and subdivision controls and building code and related ordinances will be applied within the annexed areas immediately upon the effective date of annexation. The same health services as are presently being provided within the existing City will be extended to the annexed areas immediately upon the effective date of annexation. All general administrative services of the City will be available within the annexed areas immediately upon the effective date of annexation. Following annexation, the City will employ three full-time staff personnel. The City has the financial capability of extending its normal municipal services within a reasonable time after the annexations become effective.

Parcel 1 contains 2,834 acres and fifty percent of such area has been improved with buildings. All current residential development within Parcel 1 is proceeding at a one acre density, with the exception of a parcel recently rezoned to the R–1 A district which is located on the west side of Highway 141. Commercial development is focused at the southeast and southwest quadrants of the intersection of Highway 40 and Highway 141, at the intersections of Clayton Road and Highway 141 and at the southeast corner of the intersection of Mason Road and Clayton Road. This commercial development is retail in nature. Hawthorne Office Park, which is presently improved with one building occupied by Kellwood, is on the south side of Highway 40 east of Highway 141. The Western Electric facility is located at the southwest corner of Clayton Road and Highway 141. Included within the Shell development at the southwest corner of Highway 40 and Highway 141 are both retail and office facilities. There are existing institutional facilities within Parcel 1, including the Principia campus, YMCA, the special school district under construction, State Highway Patrol facility, Mason Ridge School, and several churches. There are several nursing homes throughout the area. A portion of the properties of the Priory and Maryville are located within Parcel 1.

Parcel 2 contains 165 acres and ninety percent of such area is improved with buildings. There is an eighteen acre parcel located to the east of Mason Road which is presently unimproved. The existing development within Parcel 2 consists of subdivisions, with some residential development on parcels not included within subdivisions.

Parcel 3 contains 295 acres and fifty percent of such area has been improved with buildings. The existing development within Parcel 3 is proceeding on a one acre density basis. The property owned by McGraw-Hill within Parcel 3 comprises 75 acres, 55 of which are unimproved. The eastern section of the McGraw-Hill property, including the undeveloped portion, is zoned as part of the non-urban district and has frontage on Mason Road.

St. Louis County has several departments which render services. These include the Department of Community Health and Medical Care, Parks and Recreation, Public Works, Highways and Traffic, Police, and Planning. Certain of the services provided by these departments are available to all residents of St. Louis County, whether they reside in the unincorporated area or incorporated areas. Other services are available only within the unincorporated area. All of the services of the enumerated departments are available to annexation Parcels 1, 2 and 3. There was no evidence that the operation of any of the departments of the County government would be adversely affected by the annexation of Parcels 1, 2 and 3 by the City of Town and Country. There was evidence that there would be a loss of revenues received by the Division of Highways and Traffic and by the Police Department; there was no evidence in either instance whether such loss of revenue would be offset by a reduction in expenditures by either department by reason of elimination of annexation Parcels 1, 2 and 3.

Fire protection is provided to the annexation areas by three separate fire districts and the City of Town and Country. The northeast corner of Parcel 1 is served by the Creve Coeur Fire Protection District. The voters within this area voted to have fire protection supplied by the Creve Coeur Fire Protection District. That portion of Parcel 1 north of Clayton Road and west of Mason Road is served by the Chesterfield Fire Protection District. The vote by the residents of this area was in favor of service by Town and Country. The area sought of Clayton Road within Parcel 1 is served by Manchester Fire Protection District. The residents of such area voted in favor of service by Town and Country. That portion of Parcel 1 bounded by the existing limits of Town and Country, Clayton Road, Mason Road and Highway 40 is not presently part of a fire protection district. It has been receiving its fire protection from Town and Country pursuant to contract. Parcels 2 and 3 are served by the Manchester Fire Protection District. The voters favored the retention of service by the Manchester Fire Protection District. The Manchester Fire Protection District comprises fifteen square miles, extending from Clayton Road south to the north side of Big Bend Road, and on the east from the city limits of Town and Country and Des Peres westwardly to the east line of the Ballwin Fire District. The District has a mutual aid agreement with all of the fire departments in St. Louis County. The District maintains two firehouses, one at Manchester and Henry Road and one at Manchester and Mason Road. The Department consists of 27 employees, including a chief, an assistant chief and a deputy chief and seven paramedics. The gross revenue which is produced by the District's 1978 tax rate of sixty cents (eliminating three cents for dispatching which goes directly to Central County Fire Alarm Service) as applied to the assessed valuation of that portion of Parcel 1 within the present limits of the Manchester District is $57,613.96. The gross revenue generated by the 1978 tax rate levied by the District for ambulance service as applied to the assessed valuation of Parcels 2 and 3 is $9,851.32. The gross income of the district for 1978, including tax revenues and permit and inspection fees was just under $900,-000.00. There was no evidence as to the cost to the District of providing fire protection services either generally or per run.

The trial court, proceeding from these findings of fact, determined the City had satisfied the requirements for its proposed annexation and entered judgment authorizing the City to proceed with its annexation.

When reviewing the propriety of a decision by a legislative body, the appellate court determines whether there is substantial evidence to support the legislative decision. Thus, in reviewing a city's legislative decision to annex, if the Court determines there is no substantial evidence to show that annexation was reasonable and necessary, the annexation must be set aside; if the Court concludes there is substantial evidence that annexation was reasonable and necessary, then the issue was at least debatable and the legislative action must be permitted to stand. *Binger v. City of Independence,* 588 S.W.2d 481 (Mo. banc 1979); *City of Branson v. Biedenstein,* 618 S.W.2d 665 (Mo. banc 1981); *Mayor, Councilmen, and Citizens of the City of Liberty v. Beard,* 613 S.W.2d 642 (Mo. banc 1981). The trial court's findings of fact, uncontested on this appeal, speak with substance to the requirements for an annexation, particularly those of chapter 71, RSMo 1978, governing annexation by a city located in a first class chartered county. Hence, this review is of a *prima facie* case made on a proposed annexation as decided by the annexing city's board of aldermen. Substantial evidence shows the decision was reasonable and necessary; the issue of annexation was thus fairly debatable. Accordingly, the annexations were valid.

Appellants rely on the *Graeler* cases as support for their argument against the annexation approved in this case. They refer to the holdings that an annexation would not be upheld unless it was "reasonable to the residents and property owners of the area sought to be annexed"; and that a court must consider the interests of the County in the area to be annexed with regard to services rendered as well with regard to the County's loss of control of the area. *Graeler II* at 94.

Significantly, at the time the *Graeler* cases were decided, residents of unincorporated areas sought to be annexed had no voice in the annexation process. It fell to the judiciary to safeguard the interests of the "community" of residents of unincorporated county areas through its scrutiny of proposed annexations. Since that time, however, the legislature has acted to give affected residents a determinative voice in the annexation process.

Under current law, residents of affected areas are given the opportunity to vote in favor of or in opposition to a proposed annexation. §§ 71.015, 71.870, RSMo 1978. Absent approval by the voters in both the unincorporated area(s) and the annexing municipality, the municipality cannot perfect its proposed annexation. And because the residents who are directly affected by an annexation exercise such control, the burden of the judiciary has been modified.

When the legislature gave affected residents the right to vote on proposed annexations, it necessarily included in that grant the opportunity to consider all of the factors involved in an annexation. *See* § 71.015, RSMo 1978. As residents of St. Louis County, residents of the affected areas had to consider the needs of the parcels for municipal services; whether those needs were being met by the County; whether the County's services should be supplanted by Town and Country; whether the interests of the County would be improved or impaired by the proposed annexation. In short, they had to weigh the impact of the annexation on the totality of circumstances and consequences inherent in the choice of governmental auspices.

Thus the legislature, in enacting sections 71.015 and 71.870 provided an additional opportunity for affected persons to participate in the political process. If a party potentially subject to a change of governmental operations opposes such a change, he is provided a forum for his opposition at the ballot box. The pertinent statutes enacted since the *Graeler* cases operate to require substantial efforts for and

against annexation to take place among the residents of affected areas.

■ To the extent that the statutes do not explicitly address the interests of the County government vis-a-vis other governmental entities in annexation cases, the previous discussion makes clear that the legislature's actions modify judicial concern for such interests. Those interests are now permitted to be considered in the first instance by residents of affected areas as part of the totality of circumstances and consequences mentioned above with resultant relief to the courts of that much of their burden. To the extent that the *Graeler* cases hold otherwise, they are overruled.

It should be noted that section 71.015 and related statutes indicate that St. Louis County and municipalities located therein are not competing governmental entities, as the County has asserted. Rather, they are coexisting governmental entities that represent the residents therein. Their function is to serve the general interests of these residents, not to engage in competition for the right to collect revenues, provide services and the like. The legislature has provided the residents with the means to assert their preferences for such entities. Parties involved in annexation cases should note that the legislature's actions affirm the responsibility of government for the needs of those whom it serves, and not the needs of government in a continuing quest to serve itself.

■ There is nothing in the statutes or the charter status of St. Louis County which renders it an incorporated area for the purpose of precluding annexation by a city within the County's boundaries. The County was permitted to intervene and present its position; the issues thus raised were resolved in favor of the City. The County did not acquire any overriding position by way of an argument about the "County as a community."

The County complains also of an asserted loss of revenue and zoning control as a result of annexation. This is not an overriding issue; and questions of reasonableness as to transfers of responsibility were resolved by the trial judge. Similarly, the related charge made by all appellants that the annexations are motivated by an "unseemly" tax grab and race for land was addressed and resolved by the trial judge.

■ A number of businesses in the area were also permitted to intervene in opposition to the City's proposed annexation. They, too, received the opportunity to adduce evidence and the issues thus raised were resolved against them. They, too, have no overriding interest by which to preclude this City's annexation.

McGraw-Hill asserts a number of additional points of error:

(a) The City failed to give notice to all residents of parcel # 3 of the Board of Aldermen's meeting at which annexation was adopted. The City failed to give notice of the pendency of this litigation to all residents of parcel # 3.

McGraw-Hill relies on *Mullane v. Central Hanover Bank and Trust Co.,* 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950), to support its claim that notice reasonably calculated to reach all defendants is a requirement of due process and that individual notice is mandated where the names and addresses of the defendants are readily available. McGraw-Hill claims that the City's failure to notify all residents of parcel # 3 violated this due process requirement.

The case of *City of St. Peters v. Gronefeld,* 609 S.W.2d 437 (Mo.App.1980), is dispositive of McGraw-Hill's claim. In *Gronefeld,* opponents of an annexation asserted, as McGraw-Hill does now, that the trial court improperly permitted the action to proceed as a class action without giving notice of the pendency of the declaratory judgment suit to each member of the class. The court held there was no need to give notice to all inhabitants for the purpose of determining the question of the adequacy of class representation. To hold otherwise would lead to excessive costs and a waste of judicial resources. *Gronfeld* at 440.

Although the court in *Gronefeld* addressed the issue of notice in the limited context of class representation, its rationale applies here as well. This case was vigorously argued; those whose rights were affected by the annexation action were given every opportunity to be heard.

The statutory scheme that governs annexation repeatedly refers to methods of notice other than personal, individual notice. In preparation for public hearing on annexation, section 71.012(2), RSMo 1978, mandates notice by publication in newspapers of general circulation. Section 71.015 requires only a good faith effort to notify by certified mail all fee owners of record in an area to be annexed prior to a hearing on the proposed ordinance. The legislature's silence on the need for anything more than a good faith effort to reach fee owners by certified mail indicates the legislature's recognition of the difficulties of individual notice. To require more would subject litigants and the judicial system alike to excessive periods of delay and wastefulness. Here the parties vigorously litigated the issues in this case, as even a cursory examination of the voluminous trial transcript reveals. The essence of notice is the opportunity to have issues of direct impact voiced and addressed.

(b) The trial court erred in that there was no evidence that the named defendants in parcel # 3 represented the interests of inhabitants of that parcel. The trial court failed to make a determination whether the action was maintainable as a class action.

The court in *Gronefeld* stated that the trial court must determine whether "those who are served with summonses and who are to act as representatives of the class have been chosen so as to fairly ensure adequate representation of all the members of the class and so as to fairly and adequately protect their interests." The primary consideration in such a determination is whether diverse points of view are represented and that parties representing adverse interests litigate without collusion. *City of O'Fallon v. Bethman,* 569 S.W.2d 295, 299 (Mo.App.1978). The record shows that vigorous and adversarial litigation occurred in the trial court. *Gronefeld* also points out that a certification hearing under Rule 52.08 is inapplicable under section 71.015. *Gronefeld* at 439–440.

(c) The trial court erred in its authorization of the annexation of parcel # 3 because parcel # 3 is not an "unincorporated area of land" within the context of section 71.015.

McGraw-Hill asserts that amendments to the Missouri Constitution and the St. Louis County Charter render this Court's determination regarding the status of the county in *Graeler I* obsolete. In *Graeler I* the Court held that St. Louis County was "not, as a matter of law tantamount to an incorporated city within the concept of the annexation statutes." *Graeler I* at 836. McGraw-Hill asserts that the County today is, in effect, an "incorporated" entity, so that all land within the County is part of an incorporated entity and therefore not amenable to annexation. In support of this assertion, McGraw-Hill cites the present forms of section 18(c) of article VI of the Missouri Constitution and section 1.030 of the St. Louis County Charter, both adopted after the *Graeler* cases were decided.

Those sections delineate the various municipal services and functions that a county may perform. In many respects, the characteristics of St. Louis County in terms of its services and functions are reminiscent of a municipality. But to say that such similarities render the County an incorporated area *in toto* requires a quantum leap of reasoning that would have unintended impact on the courts and citizens of the County. That portion of *Graeler I* which refused to extend incorporated status to the County remains viable.

(d) The trial court erred in rendering a single combined judgment with respect to the three separate causes consolidated for trial.

The trial court entertained extensive offers of evidence on all three tracts of land sought to be annexed. Each party had

ample opportunity to litigate issues peculiar to its respective parcels. The trial court's single judgment reflected consideration of findings of fact relating to each tract of land. McGraw-Hill relies on cases interpreting Rule 42(a) of the Federal Rules of Civil Procedure to suggest that consolidation of causes resulting in a single judgment in turn results in prejudice to a party's appellate rights. No such prejudice resulted here. All issues were fully litigated and a complete record was made. No purpose would be served by requiring the trial judge to enter three separate judgments identical in every way except for the name of the individual parcel affected.

> (e) The trial court erred in refusing to permit Jane Mudd's deposition testimony into evidence because such testimony contained admissions against interest of the City and was therefore relevant.

Although it is true as McGraw-Hill asserts that a deposition of a party may be used by an adverse party for any purpose, the record shows that any error that may have been committed by the ultimate refusal to admit the testimony was not reversible error. Prejudicial or reversible error in the admission or rejection of evidence is not an issue on appeal in any case tried before the judge without a jury. *Thau-Nolde, Inc. v. Krause Dental Supply & Gold Co., Inc.,* 518 S.W.2d 5, 9 (Mo.1974), citing *Martin v. Norton,* 497 S.W.2d 164 (Mo.1973). In any event, no prejudice resulted in the refusal to admit the deposition. Mrs. Mudd was cross-examined extensively, and the trial court was within its discretion to exclude the evidence in question.

> (f) The trial court erred in permitting Mayor Schneider to testify concerning ambulance service in the City at the time of the suit.

McGraw-Hill suggests that only conditions that existed at the time of the commencement of the suit are relevant to a determination of the reasonableness of the annexation. It relies on *City of Salisbury v. Nagel,* 420 S.W.2d 37 (Mo.App.1967), for this proposition.

In *City of O'Fallon v. Bethman, supra,* however, the court found that evidence existing at the time an annexation suit is tried that reflects on the reasonableness of projections made at the time the suit is filed is admissible. *Bethman* at 672. Thus, conditions existing at the time the case was tried were relevant as a matter of law to the City's ability to furnish municipal services within a reasonable time. The trial court properly permitted Mayor Schneider to testify concerning ambulance services under its burden to determine whether the reasonableness and necessity of the annexation was fairly debatable.

Western Electric claims that it was denied due process of law and equal protection of the laws because it was not permitted to vote in the annexation elections concerning parcel # 1. It asserts that institutional and corporate landowners have "at least as extensive constitutional rights" as individual residents of an area to be annexed.

Western Electric as an intervenor received the opportunity to adduce evidence and address the issues thus raised. It also had the opportunity to inform voters in affected areas of its position against annexation. To suggest that in addition the corporation should be permitted to cast a vote would be to raise the corporation to a legal status inconsistent with the nature of the corporate entity. Western Electric's constitutional rights were adequately protected. It is not improper to annex an area containing a business facility which lay outside the city prior to annexation. *Binger, supra.* A business necessarily subjects itself to local government as is established in accordance with law.

The trial court properly assessed the evidence submitted and concluded that the reasonableness of the annexations was fairly debatable. Insofar as the *Graeler* cases are inconsistent with the standard of review as enunciated in subsequent cases interpreting sections 71.015 and 71.870, RSMo 1978, they are overruled. The judgment is affirmed.

BLACKMAR and DONNELLY, JJ., and LOWENSTEIN, Special Judge, concur.

GUNN, J., dissents in separate opinion filed.

RENDLEN, C.J., and BILLINGS, J., dissent and concur in separate dissenting opinion of GUNN, J.

WELLIVER, J., not sitting.

GUNN, Judge, dissenting.

The majority opinion sets forth the proper scope of review in this annexation case— is there substantial evidence to show that the annexation was reasonable and proper? *City of Branson v. Biedenstein,* 618 S.W.2d 665, 667 (Mo. banc 1981). Is the question of reasonableness fairly debatable? If so, then the action of the legislative body is conclusive. *Binger v. City of Independence,* 588 S.W.2d 481, 483 (Mo. banc 1979). Review is not by trial de novo. *City of St. Charles v. Schone,* 569 S.W.2d 769, 774 (Mo.App.1978); *City of Perryville v. Brewer,* 557 S.W.2d 457, 463 (Mo.App.1977).

The majority opinion finds that there was substantial evidence to support the trial court's decision that the annexation was reasonable and necessary. According to the majority, the issue of annexation was reasonable and necessary. In so doing the majority thoroughly attenuates *City of Olivette v. Graeler,* 338 S.W.2d 827 (Mo.1960) (*Graeler I*) and *City of Olivette v. Graeler,* 369 S.W.2d 85 (Mo.1963) (*Graeler II*).

Contrary to the majority, I must conclude that the City of Town and Country has failed to carry its burden of showing that the annexations were reasonable and necessary under the circumstances. Furthermore, I am convinced that this case provides substantial reason for sustaining and following the fine principles of the *Graeler* cases. I do not believe that the legislative modification of chapter 71 dealing with annexation by consideration of the voters of the annexation area should have any impact on the effect of the *Graeler* decisions.

Since becoming a fourth class city in 1974, highly fashionable Town and Country has been governed by a four person board of aldermen and a mayor. Each of the officials receives a yearly compensation of one dollar. It also employs a small administrative and professional staff. The municipal government office is open four and a half hours a day, five days a week, but many of the city employees are part-time and have no scheduled office hours. It does not have a public works department, parks department, recreational department or environment services department; it has no parks. Its sewer system is within the Metropolitan St. Louis Sewer District. The police and fire departments are melded into one small department called the Department of Public Safety, with police and fire fighting personnel changing costumes of authority as the particular occasion arises. The city employs outside contractors, in many cases St. Louis County, to enforce health and safety regulations, fire, plumbing and building codes, mosquito and rabies control and provide maintenance to a limited number of streets. An alderman serves as street commissioner in charge of contracting for road services on the 3.2 miles of roads outside subdivisions. The private subdivisions, which incorporate most of the city, maintain their own roads, except for certain signs and snow removal to aid emergency vehicles required to operate within the subdivisions.[1]

The proposed areas of annexation are three irregularly shaped tracts of unincorporated land adjacent to Town and Country's western and southern borders. The first parcel is the largest of the three. It is 50 percent developed and has various and diverse residential, commercial and institutional developments. Western Electric Company and its companion intervening defendants are located in parcel 1. The second parcel is the smallest of the three parcels. It is 90 percent developed and is almost totally residential. The third parcel

---

1. Town and Country maintains a portion of one city street and all of three others for a total of 3.2 miles. There are 21 miles of private roads which are not maintained by the City. The state maintains the balance of the roads which are within or border the City.

is 50 percent developed. Parcel 3 contains both residential and industrial developments. Intervenor McGraw-Hill is located in parcel 3. The total area of the proposed annexations is larger than Town and Country. In the areas proposed to be acquired, St. Louis County provides ample municipal services including police, planning and zoning, highway and traffic, public works, parks and recreation and health. The Manchester Fire Protection district provides substantial fire protection service to most of the proposed annexation area and backup service to Town and Country. The Creve Coeur and Chesterfield Fire Protection Districts cover the rest of the annexation areas; a small portion is protected under contract by Town and Country. St. Louis County police provide twenty-four hour service in both areas, but Town and Country disputes its effectiveness.

The concepts of "reasonableness" and "necessity" as used in § 71.015 and pertaining to annexation are recognized as closely related, though separate. *City of O'Fallon v. Bethman,* 569 S.W.2d 295, 302 (Mo.App. 1978). Both the city and the area to be annexed are entitled to the test of reasonableness. *City of Olivette v. Graeler,* 338 S.W.2d 827, 837 (Mo.1960) (*Graeler I*); *City of Cameron v. Stafford,* 466 S.W.2d 115, 120 (Mo.App.1971). And the annexing city bears the burden of demonstration that its proposed action is reasonable. *Young v. Mayor, Council and Citizens of the City of Liberty,* 531 S.W.2d 732, 737 (Mo. banc 1976).

A case of reasonableness is accomplished when it appears that the land annexed is so situated as to be adaptable to urban purposes, and necessary or convenient to reasonable exercise of the city government. *Brewer,* 557 S.W.2d at 462. The city bears the procedural burden of establishing the statutory elements in an annexation proceeding. *Graeler I,* 338 S.W.2d at 833; *City of Cameron v. Stafford,* 466 S.W.2d at 119.

Annexation cases necessarily involve a multitude of factors[2] which may be considered in determining the reasonableness of the legislative decision to annex. It is fundamental that each relevant factor should be considered in relation to the others with no single factor being determinative. *City of Des Peres v. Stapleton,* 524 S.W.2d 203, 207 (Mo.App.1975). Necessarily, each case must be decided on its own individual facts. *City of St. Peters v. Kodner Development Corp.,* 525 S.W.2d 97, 99 (Mo.App.1975).

The need for individual consideration is especially relevant in annexation cases involving St. Louis County because of the uniqueness of the circumstances. Specifically, the City of Town and Country is substantially less sophisticated in development and as a provisioner of municipal services than the unincorporated area of St. Louis County which it seeks to bring into the fold of its limits and limited services.

---

**2.** Some factors which courts have considered for annexation approbation include the following: (1) there must be a need for residential or industrial sites within the proposed area; (2) the city is unable to meet its needs without expansion; (3) only needs which are reasonably foreseeable and not visionary should be considered; (4) past growth may be relied on to show future necessity; (5) in evaluating future needs, the extent to which past growth has caused the city to spill over into the proposed area should be considered; (6) the beneficial effect of uniform application and enforcement of municipal zoning ordinances in the city and in the annexed area may be considered; (7) the need for or the beneficial effect of uniform application and enforcement of municipal building, plumbing and electrical codes; (8) the need for or the beneficial effect of extending police protection to the annexed area; (9) the need for or the beneficial effect of uniform application and enforcement of municipal ordinances or regulations pertaining to health; (10) the need for and the ability of the city to extend essential municipal services into the annexed area; (11) enhancement in value by reason of adaptability of the land proposed to be annexed for prospective city uses; and (12) regularity of boundaries. *City of Perryville v. Brewer,* 557 S.W.2d 457, 462 (Mo.App.1977).

*See also* Note, Annexation by Municipality of Adjacent Area in Missouri: Judicial Attitude Toward the Sawyer Act, 1961 Wash.U.L.Q. 159, 160–62. For a capsulated rendering of the abundance of Missouri law dealing with the modalities of annexation, *see* 1 Antieau, Municipal Corporation Law, § 1A.40 (1983) and 1 Sands and Libonati, Local Government Law, § 8.30 (1981).

The incongruency of this situation has been recognized previously. In *City of St. Peters v. Kodner Development Corp.*, 525 S.W.2d 97 (Mo.App.1975), the anomaly of annexations in urban areas as compared to rural areas was specifically discussed:

> Certain guidelines which have applicability to annexations involving a city or town located in an essentially rural area are of little benefit when dealing with urban or suburban areas. In the former cases people are locating within an established city and annexation becomes a necessity when the geographic limits are unable to contain the population desirous of locating in the city and it begins spilling over into surrounding land. But it is still the city or town, surrounded by rural or non-residential land, to which the population is affixing itself. A different phenomonon is involved when dealing with America's middle-age problem—urban spread. There the population is associating itself with a large metropolitan area, without regard generally to the particular city, town, village or county in which it is locating. Rather the considerations are proximity and access to an overall metropolitan job market.

*Id.* at 99.

*City of Olivette v. Graeler*, 369 S.W.2d 85, 95 (Mo.1963) (*Graeler II*) is foremost in speaking for the distinctive character of St. Louis County in relation to annexation:

> It seems obvious that in this highly developed and substantially urbanized community we have a situation materially different from those which exist in annexation proceedings elsewhere. This "area" has more services and advantages available and has less need for the City's services; the County has the facilities and the organization to furnish the necessary services; the area is, in large part, highly developed through no act of the City, directly or indirectly; and the County here, by annexation, would lose control of an area which constitutes an integral part of its future plans. In such a situation it would be difficult to establish an overall reasonableness and necessity, considered in the light of our recent constructions of the Sawyers Act.

*Graeler I* and *Graeler II* each identifies several factors to be considered in annexation cases arising in St. Louis County:

> [T]hat upon the consideration of reasonableness, the fact that municipal services were presently being rendered in the area should be weighed; that the people of both the City and the proposed area are entitled to the benefit of the test of reasonableness; ... that it is in order to consider what the 'proper development' of a city is in light of existing conditions (such as the multitude of annexations and incorporations in St. Louis County), as an element of necessity and reasonableness; that the development of the county must be considered and '*the interest of the county as a community must be weighed against the claims of the city ....*'

*Graeler II*, 369 S.W.2d at 93; *Graeler I*, 338 S.W.2d at 838. (Emphasis added.)

Town and Country argues that the impact of the *Graeler* decisions has been so thoroughly enervated as to cause each to fall into desuetude. In support, it cites numerous cases in which the County unsuccessfully opposed annexation in the trial court.[3] But with the increased sophistica-

---

3. Town and Country cites the following cases in which the County unsuccessfully opposed annexation in the trial court: *Witt v. City of Webster Groves*, 398 S.W.2d 16 (Mo.App. 1965); *City of Creve Coeur v. Huddleston*, 405 S.W.2d 536 (Mo.App.1966); *City of Creve Coeur v. Brame*, 446 S.W.2d 173 (Mo.App.1969); *Hudson Community Ass'n v. City of Ferguson*, 456 S.W.2d 581 (Mo.App.1970); *St. Louis County v. Village of Peerless Park*, 494 S.W.2d 673 (Mo.App.1973); *City of Des Peres v. Stapleton*, 524 S.W.2d 203 (Mo.App.1975). However, in both *Des Peres* and *Hudson Communi-* *ty Association*, the court noted that the interest of the County must be considered. In the majority of cases cited by Town and Country, St. Louis County did not appeal the judgment in favor of annexation. Therefore, on appeal, the County's interest was not at issue. These cases do not signal an abandonment of the requirement in the *Graeler* decisions to consider the interest of the County as a community. *See* Lauer, Municipal Law in Missouri, 28 Mo.L.Rev. 555, 580–82 (1963) for a discussion

tion of the unincorporated area of the County and its services, rather than being anachronistic, the substance of the *Graeler* cases is more to the fore and cogent; those cases should endure, for their holdings are even more pertinent and poignant to the circumstances of this case.

The *Graeler* decisions would not destroy the vestigial remnants of annexations in St. Louis County as lamented by the City. Yet, the vitality of the "county as a community" concept must be recognized and, accordingly, the effect of the annexation on St. Louis County must be considered as a proper concern—as it has in the past—in order to determine reasonableness. So I must disagree with the majority's devitalization of the concepts contained in those cases.

A review of the trial court's findings of fact and conclusions of law indicates that it failed to weigh the interest of the County as a community against the claims of the city. *Graeler II*, 369 S.W.2d 93. The trial court made forty-two separate findings of fact but only one related in any regard to the interest of the "county as a community." The trial court found:

> There was no evidence that the operation of any of the departments of the County government would be adversely affected by the annexation of Parcels 1, 2 and 3 by the City of Town and Country. There was evidence that there would be a loss of revenue received by the Division of Highways and Traffic and by the Police Department, but there was no evidence in either instance as to whether or not such loss of revenue would be offset by a reduction in expenditures by either department by reason of elimination of annexation of Parcels 1, 2 and 3.

None of the court's conclusions of law addresses the factors identified in the *Graeler* cases regarding the County's interest.

This Court in *Graeler II* stated that a determination of reasonableness requires "a consideration of the interest of the County in the area generally and the effects of the proposed annexation, not only in connection

of the impact of the *Graeler* decisions on an-

with services rendered, but in a loss of control of the area and in such other ways as would vitally affect the County." *Graeler II*, 369 S.W.2d 94. In the trial court's decision there was no consideration given to the special aspects that are presented by an annexation in St. Louis County, and the findings of the trial court cannot be construed as a balancing of the interests of the County and Town and Country. Thus, the trial court's determination of reasonableness is antagonistic to the requirements and holdings of the *Graeler* cases. But, of course, the majority vitiates the *Graeler* decisions.

An examination of the competing interests establishes that St. Louis County has several important interests at stake. Affirmance of these annexations pertaining to St. Louis County would set an unfortunate precedent for future annexations with immediate and direct deleterious effects. The County would lose substantial tax revenues. An example would be an anticipated cigarette and utility gross receipts tax loss of $317,000 to the St. Louis County Police Department. The County projects that if the annexations are approved, its loss in tax revenue will begin at $1,000,000. The trial court determined that some County departments would lose revenue as a result of the annexations, but that there was no evidence to show whether or not the loss would be offset by a reduction in County services to the annexed areas. However, that rationale is out of phase with *Graeler II*. An exchange of a loss in revenue for a reduction of service would result in a "whittling away" of the County's governmental organization. *Graeler II*, 369 S.W.2d at 95.

Considering the impact of the revenue loss, in conjunction with the loss of control and planning, and the loss of developable land, the adverse effect on the County as a community is consequential. The annexations would deprive the County of its control and planning over the annexed areas' development, and County government is positively active in the planning and zoning

nexations in St. Louis County.

of the unincorporated areas. The annexations would also deprive the County of valuable developable land beneficial for all its residents. Instead of being beneficial to the entire County, any development within the parcels would be limited in benefits to only Town and Country. The evidence shows that Town and Country lacks the County's expertise in planning; in fact, it has no expertise but relies on the County for its own purposes. After studying the proposed annexations, the County's Department of Planning concluded that the annexations would:

> [F]reeze development in one of the most accessible and developable portions of Central West County and would enlarge the tax base of the City of Town and Country considerably. The proposed annexation is clearly not in the best interest of all area residents or the citizens of St. Louis County as a whole.

The evidence adduced at trial firmly established that basically, Town and Country has two interests at stake: increased tax revenues and zoning protection, neither of which is a proper basis for annexation. As early as 1975 Town and Country began to view annexation as a possible solution to its perceived financial problems and as a way of gaining a stronger rezoning position against commercialization. In 1975 a committee appointed by the Mayor reported that by annexing unincorporated lands to the west and south the City would derive an additional $77,500 to $115,000 a year in taxes. After the decision to annex had been made, the City explained its decision to the voters. In a letter to the residents of Town and Country dated February 2, 1977, somewhat striking against County hegemony, the Mayor and Board of Aldermen explained the rationale for annexing the three parcels:

> Through annexation, Town and Country would—
> 1. Gain a sizable commercial tax base and a growing residential tax base;
> 2. Achieve vital zoning protection on its borders;

> 3. Insure the survival of Town and Country beyond the mid 1980s;
> 4. Reduce real estate taxes;
> 5. Avoid imposition of nondeductible taxes.

The letter urged Town and Country's residents to approve the annexation of the parcels because rejecting them would, by law, foreclose a resubmission of the proposals for two years, and "[b]y that time other cities could have annexed the area." The Mayor and Board mailed similar letters in March and April. These letters indicate the same type of race for land that this Court termed "unseemly" in *Graeler II,* 369 S.W.2d at 95.

Neither of the two major articulated interests of the City for annexation provides legitimate purpose. Courts have long disfavored the use of annexation solely for tax purposes. *See City of Fulton v. Dawson,* 325 S.W.2d 505, 518 (Mo.App.1959). Nor is annexation solely for zoning protection a reasonable justification. *City of Odessa v. Carroll,* 512 S.W.2d 862, 868 (Mo.App.1974).

An examination of the proposed annexations leads to one conclusion: Whether each parcel is considered separately or together, the reasonableness of these annexations is not fairly debatable. Town and Country's letters to its residents evince a desire to win the race against other municipalities in a contest to annex valuable unincorporated territory. In approving the annexation, the trial court failed to consider the interest of St. Louis County as a community, and it is necessary that it do so.

Town and Country and the *amici curiae* Missouri Municipal League decry anything short of full approval of the annexation. They urge that denial rings the death knell for any annexation in St. Louis County. That is not so. But it is so that the *Graeler* cases and those following would make it more difficult for an annexing authority to meet its burden of showing that its taking over in an area in St. Louis County is reasonable, applying the proper dialectical test.

I am guided in the application of existing law to the facts of this case by the distinctive nature and circumstances pertaining to

St. Louis County and its substantially advanced, highly urbanized development—a fact even more apparent now than at the time of the *Graeler* cases (1960 and 1963). That makes the impact of those two cases with the other law recited in this dissent increasingly appropriate at this time.

Town and Country directs our attention to *Mayor, Councilmen and Citizens of the City of Liberty v. Beard,* 613 S.W.2d 642 (Mo.App.1981), *modified* 613 S.W.2d 641 (Mo. banc 1981), approving a Sawyers Act annexation in Liberty near Kansas City. That case was cited by the City to emphasize the standard of review. And it does follow those cases previously indicted in this opinion regarding review, *e.g., Binger v. City of Independence, supra,* and *City of St. Peters v. Kodner Development Corp., supra.* But the remarkable feature of the *Liberty* case is that it places a highlight on the precise reason for denying annexation in this case. In *Liberty,* the emphasis of the annexing city was that it was growing and becoming more urbanized. As a consequence, it was essential that the city control future development in the adjoining unincorporated area. As stated by the court:

> Plaintiff City argues that the evidence shows the annexation was proposed because it was believed by the City officials and their professional consultants that the entire area was beginning to urbanize; that once urbanization begins on the doorstep of a city, it not only continues, but accelerates, making it essential for the City to control that urbanization and development. * * * In addition, the area itself is attractive to the existing City and its services. * * *

> Since urbanization has begun in the entire area, and since it can be expected to continue and accelerate because the area lends itself to urbanization, the expert witnesses testified that it should be annexed by the City. The evidence was based on the experts' testimony that county government cannot cope with the sophisticated control of urban type development. As more and more development occurs in this area, there will be an increasing need by the people in the area proposed for annexation for city services. * * *

*Id.* at 644.

The foregoing from *Liberty* stands as gleaming contradistinction between the situation in this case in St. Louis County and annexations elsewhere. In *Liberty,* the city was growing and developing. It needed to control the adjoining unsophisticated territory. However, in this case the unincorporated area of the County outurbanizes the City so that scant basis exists for comparison. Town and Country's effort is the classic case of the tail attempting to wag the dog. And that does not constitute a legitimate purpose for annexation.

Under the circumstances of this case and applying applicable legal standards, there was no fairly debatable showing that the annexations were reasonable and necessary. In my opinion Town and Country has failed to carry its burden. The annexations should fail, and I must dissent from the majority finding otherwise.